# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs October 29, 2014

## STATE OF TENNESSEE v. LUCIAN ALAN GREEN

**Appeal from the Circuit Court for Robertson County**
**No. 2013-CR-447      Michael R. Jones, Judge**

---

**No. M2014-00242-CCA-R3-CD - Filed December 2, 2014**

---

In a two-count indictment, appellant, Lucian Alan Green, was charged with burglary of a building other than a habitation and theft of property valued at more than $1,000 but less than $10,000, both Class D felonies.  The jury found him guilty as charged, and the trial court sentenced him as a standard offender to concurrent terms of three years, six months at thirty percent release eligibility for each offense to be served in the Tennessee Department of Correction.  Appellant now challenges the sufficiency of the convicting evidence and the trial court's sentencing decision.  Upon our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT H. MONTGOMERY, JR., JJ., joined.

Joe R. Johnson II (on appeal); and Garth Click (at trial), Springfield, Tennessee, for the appellant, Lucian Alan Green.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and Jason White, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case involves the burglary of a church and theft of a laptop belonging to one of the ministerial staff.

I. Facts

A. Trial

At appellant's November 2013 trial, the State called the victim of the theft, Robert E. MacKenzie, as its first witness. He was the youth minister at the Main Street Church of Christ in Springfield. To carry out his responsibilities, the church provided the victim with an Apple MacBook Pro laptop computer. At the time of the theft, he had been in possession of the computer for approximately one and one-half years. The computer was valued at $1,500 when it was purchased. In addition, the victim purchased several computer programs at his own expense such as an office suite and a video-editing program that totaled approximately $300. The victim stated that at the time of the theft, the computer was in "perfect condition" and would have been valued between $1,500 and $2,000.

The victim explained that the church's office building was an old house and that the church secretary occupied the front area of the building, which would have been the main living room of the house. The victim's office was adjacent to her office, and the head minister's office was in the rear of the building. On March 20, 2013, the office building was opened at 8:00 a.m. and closed around 4:00 p.m. When the victim left that day, his computer was on his desk, and no one had permission to take it. When he returned to work on March 21, his computer was missing, as was the power cord and the shipping box, which had been under his desk. Nothing else was missing from his office. The victim noticed that someone had entered through his window, which was constructed of Plexiglass. "[T]he glass was pushed in, meaning they [could] reach underneath the glass and unlock the window and then push the window up from the outside and gain access." He observed that the pictures of his wife and son that were located on a table in front of the window were knocked down. The victim said that he immediately telephoned law enforcement upon discovering the theft.

The victim recalled that his computer had a feature called "Find my iPhone," which allowed him to activate the GPS on the computer when it was connected to a wireless network. He logged on to his iPhone to trace the computer, and he received a notification around 2:20 p.m. that same afternoon. The notification read, "Sean's Mac Book is located []," and it provided an address and coordinates. The victim explained that the notification would generally bear his name, Robert, but that someone had essentially reprogrammed his computer and changed the owner's name. When the victim received a name and address, he telephoned the detective in charge and gave him the information. By that night, officers had recovered the computer. The victim received the computer the following day, but because of the programming changes, all of his files and software had been "swiped clean." The files included curriculum, journals of conversations with teenagers, personal journals, and videos he had been editing. In sum, the victim estimated that "thousands of hours [were] just gone."

The victim testified that he knew appellant through a mutual acquaintance at the Robertson County YMCA. He had not seen appellant near the time of the theft.

On cross-examination, the victim acknowledged that during the time he owned the computer, newer models of the Apple MacBook had been released and newer versions of the software he had purchased had also been released.

The State's next witness was Stephanie Keys, a children's service officer at the Woodland Hills Youth Development Center. Appellant was her former step-brother. At the time of the theft, Ms. Keys had not been in contact with appellant for "a few months." However, around 3:00 a.m. on March 21, 2013, he telephoned her. She was awake because she was working a double shift. Ms. Keys recalled that appellant informed her that he had no place to sleep that night and asked if he could come over, which he had done on occasion in the past. She said that he could but told appellant that she did not finish her shift until 6:00 a.m. Appellant also told Ms. Keys that he had something in which he thought her brother, Sean[1] Perry, may be interested. Appellant telephoned Ms. Keys shortly after 6:00 a.m. and told her that he was en route to her boyfriend's house, where Ms. Keys lived at the time. He arrived at the house around 6:30 a.m., and he had a DVD player with him. After making appellant comfortable on the sofa, Ms. Keys retired to her bedroom upstairs and awakened at 11:30 a.m. Appellant, who was still there, asked her to call her brother and inquire if he wanted to purchase an Apple laptop from him. Mr. Perry was interested in the computer and met appellant at Ms. Keys' residence between 12:00 and 12:30 p.m. Appellant retrieved the computer from his vehicle, and they began to discuss a purchase price. Ms. Keys recalled that at one point, appellant said "that he had got[ten] it from some other person that had [given] him another laptop that did not work, and they gave him this one to replace that one." Mr. Perry and appellant walked outside to conclude their business, and Ms. Keys began to get ready to go to work. When she left the house to go to work, both men had departed. She was not privy to what transpired outside, but she was aware that Mr. Perry intended to purchase the computer.

Sean Perry testified next and stated that appellant had been his step-brother until his mother and appellant's father divorced in 2011. In 2013, Mr. Perry had not seen appellant in approximately five to six years. On March 21, 2013, Mr. Perry's sister, Ms. Keys, contacted him about a computer that appellant was selling. Mr. Perry and appellant had already negotiated the price of the computer before he arrived at Ms. Keys' residence; he would pay $300 in cash and would cancel out a $300 debt that appellant owed him. When

---

[1] Mr. Perry's first name is spelled both "Sean" and "Shawn" in the transcript. When he was called to testify, he spelled his last name but not his first name. For consistency, we will use the first spelling that was given by the victim.

Mr. Perry arrived, he inspected the computer and characterized it as being in "good condition." He estimated that the same computer would retail from $1,200 to $1,500 in stores. Appellant told Mr. Perry that he acquired the computer from someone for whom he had performed work but who could not pay the bill. Because appellant had taken control of his father's heating and air conditioning business, Mr. Perry "assumed" that the debt had been incurred in that line of work.

After Mr. Perry returned to his home, it took about two hours for him to log on to the computer with his personal Apple ID, install his own software, and set up the computer to his preference. He encountered a problem when the computer requested a PIN, so he returned the computer to the box and decided to take it to the Apple store the next day for assistance. He said that police arrived within thirty minutes of his repackaging the computer. Mr. Perry testified that when he purchased the computer, he had no idea that it was stolen and that he had not been compensated for the $300 he paid for it.

On cross-examination, Mr. Perry denied having reformatted the computer or changing the operating system or settings. He acknowledged that he thought that $600 was a "good deal" for an Apple laptop. He stated that Apple products tend to retain their value better than generic models would.

The State's next witness was Detective Madison Burnett with the Springfield Police Department. He investigated the theft and burglary of the Main Street Church of Christ office building. During the course of his investigation, he did not recover any latent fingerprints, but he noticed footprints throughout the office building that matched those from outside the window. Detective Burnett also obtained the serial number of the computer. Later in the day, the victim contacted Detective Burnett and informed him that he received a notification about the location of the computer. He traveled to the indicated location and recovered the computer around 5:30 p.m.

Detective Burnett testified that after interviewing Mr. Perry and Ms. Keys, he began trying to locate appellant. Before Detective Burnett could locate appellant, appellant telephoned him. Detective Burnett asked appellant to come to the police department, and appellant told him that he might be able to identify the person from whom he bought the computer. He told Detective Burnett that he purchased it from "a skinny white guy." Appellant arrived thirty to forty-five minutes later. His story began with purchasing the laptop during the day of March 20, which Detective Burnett knew to be false because the computer was still in the victim's possession at that time. Appellant then described "this white male subject and [said] he was rough looking [and] wore a hoodie." Detective Burnett testified to the content of appellant's statement, dated March 22, 2013, at 9:25 a.m.:

He says that he bought the computer the day before yesterday [March 20] for [$125] and said the white male was trying to get [$200] but he wouldn't give him that. "I got it from him at the parking lot of Discount Tobacco Store, from a white male with three or four inch beard. I would say he was about thirty. He looked rough. He was skinny, he was wearing a white hoodie. I called my sister to get my brother's number and he agreed to buy it. I gave him [$200] cash - I'm sorry, he gave me [$200] cash and a [$100] gift card to Best Buy. I bought two CD's and an FM transmitter and a charger at Rivergate. I put the FM transmitter[,] which allows my phone to play music[,] in my car. I drove [here] on my own. I did come here of my own free will."

When appellant completed his statement, he indicated his desire to look through photographs and attempt to identify the person from whom he purchased the computer. Detective Burnett stated that at that time, he told appellant that he knew he was lying and advised him of his rights. Appellant exclaimed, "'You know it was Dustin, you know Dustin Trenoff is the one doing all these burglaries[,] and I will take you straight to him.'" Appellant gave Detective Burnett an address of an apartment complex and maintained that Trenoff could be found there. Detective Burnett arrested Trenoff at the appointed location.

On cross-examination, Detective Burnett acknowledged that Trenoff was charged for his involvement in the Main Street Church of Christ burglary and theft.

The State's final witness was Dustin Trenoff. He was serving a fourteen-year sentence at thirty-five percent release eligibility for burglary and had previously served several sentences for property-related crimes. Trenoff blamed his drug addiction for his propensity to commit property crimes. Trenoff had been granted a furlough from the county jail to attend an uncle's funeral, but when he did not return, he was charged with escape. He was on escape status on March 20, 2013. He left the abandoned house where he was staying to steal property at appellant's request. Trenoff stated that appellant "fronted" him a "rock" of cocaine, for which Trenoff would reimburse appellant after he made some money by disposing of stolen property. Appellant drove Trenoff to the church, where they parked and broke into the building between 1:00 and 2:00 a.m. Trenoff clarified that they both "broke" in but that he was the only one who "went" in. He gained entry by placing a screwdriver in the window and "jimmying" it up. Trenoff retrieved a laptop computer and placed it inside the box he found underneath the desk. He then passed it to appellant but remained inside to see if there was anything else he could steal. Trenoff and appellant agreed that the price of the laptop would be $100 and that they would split the proceeds in half. Appellant paid Trenoff in cocaine; he gave Trenoff a gram of cocaine, which was worth about $50 to $60.

Trenoff said that when he was first apprehended and arrested, he did not mention appellant's involvement. He maintained that there was a "convict code or honor among

thieves," which meant "not snitching." Accordingly, he lived by that code and protected appellant until he learned that appellant had implicated him. In exchange for his testimony, Trenoff had been told that the parole board would be notified of his cooperation. At the close of this testimony, the State rested its case-in-chief.

Appellant testified on his own behalf. He stated that Trenoff called him "in the middle of the night" and said he had a laptop for sale, so appellant met him in a parking lot. They negotiated the price, and appellant purchased the laptop. Appellant then telephoned Ms. Keys and went to her house around 6:00 a.m. on the morning of March 21. When she awakened between 11:00 a.m. and 12:00 p.m. that day, she contacted Mr. Perry who drove over. Mr. Perry purchased the computer for $200 and a $100 gift card. Appellant said that Mr. Perry asked if the computer was stolen and that he answered, "'Not to my knowledge.'" He denied telling Mr. Perry anything about bartering the computer for work performed or money owed to him.

Thereafter, Ms. Keys' boyfriend contacted appellant and told him that the computer had been stolen. Appellant said that in a desire to "clear his name," he contacted the Springfield Police Department. He drove to the police department to give a statement and look at photographs, but while there, he was booked for burglary. Appellant then implicated Trenoff as the one breaking into area churches. He denied having accompanied Trenoff to burglarize the Main Street Church of Christ. Appellant stated that before he sold the computer to Mr. Perry, he tried to reset it so that "it would be like a brand new computer" when Mr. Perry bought it. Appellant admitted selling cocaine to Trenoff previously and trading him cocaine for the computer.

## B. Sentencing Hearing

At appellant's January 2014 sentencing hearing, the State offered the presentence report and a certified copy of an order of probation revocation as evidence. Appellant again testified on his own behalf. He stated that he had obtained a GED and that he had attended "some" college classes. He was also a certified heating and air-conditioning technician but was working for a construction company at the time. He resided part of the time at his girlfriend's residence and part of the time at his grandmother's residence.

Appellant explained that his probation revocation was a "kill sentence," meaning that to effectuate a plea agreement, a prior order of probation would be revoked so the sentences could be served at one time. After that, he successfully completed the terms of a community corrections sentence. He said that if he were granted probation, he would reside with his grandmother, who was a pastor of a church called "Manna Ministries" and lived on the church campus in Union City. Appellant also agreed that information he provided to law enforcement led to the apprehension and arrest of Dustin Trenoff. He confirmed that he had

already paid restitution to Mr. Perry in the amount of $300. Appellant said that if he were granted probation, he would "live by the book."

In determining appellant's sentence, the trial court stated on the record that it considered the requisite factors. The trial court applied Tennessee Code Annotated section 40-35-113(1), that appellant's criminal conduct neither caused nor threatened serious bodily injury, but it did not attribute much weight to it as a mitigating factor. The court also considered Tennessee Code Annotated section 40-35-113(9), that appellant assisted the authorities in uncovering offenses committed by other persons or in detecting or apprehending other persons who had committed offenses. It did not attribute much weight to that factor because, it reasoned, appellant did not offer this assistance "until they already had him pretty well dead to rights with the possession of a stolen laptop." As enhancing factors, the trial court found support for Tennessee Code Annotated section 40-35-114(1), that appellant had a previous history of criminal convictions in addition to those necessary to establish the appropriate range.

Reviewing appellant's presentence report, the trial court noted one felony and several misdemeanors, including convictions for failure to appear, domestic violence, possession of marijuana, and assault. The trial court found that the one applicable enhancement factor was "very strongly weighed" by the court. As such, the trial court imposed sentences of three years, six months for each felony conviction.

Moreover, the trial court found that confinement was necessary to protect society by restraining a defendant who has a long history of criminal conduct. In so holding, the trial court noted not only the volume of criminal convictions but also the fact that there was not much time during which appellant did not have a pending criminal charge against him. It also concluded that measures less restrictive than confinement had frequently or recently been applied unsuccessfully. The trial court noted that on July 22, 2011, appellant pleaded guilty to two counts of domestic violence, evading arrest, failure to appear, and driving on a suspended license, which were committed during an eleven month, twenty-nine day probationary period that commenced on August 20, 2010. Thus, the trial court denied alternative sentencing.

It is from these judgments that appellant now appeals.

## II. Analysis

### A. Sufficiency of the Evidence

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the

prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

Appellant contests the sufficiency of the evidence underlying his convictions for burglary of a building other than a habitation and theft. Specifically, he contends that "there was absolutely no way that a rational trier of fact could give more credibility to Trenoff's testimony than to [appellant's] testimony."

As charged in this case, "[a] person commits burglary who, without the effective consent of the property owner[,] [e]nters a building other than a habitation (or any portion thereof) not open to the public, with intent to commit a felony, theft or assault . . . ." Tenn. Code Ann. § 39-14-402(a)(1). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id.* § 39-14-103(a). Appellant was charged with a Class D felony theft, which is theft of property valued at $1,000 or more but less than $10,000. *Id.* § 39-14-105(a)(3). The trial court also instructed the jury with regard to

criminal responsibility for another. "A person is criminally responsible for an offense committed by the conduct of another, if[,] [a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense . . . ." *Id.* § 39-11-402(a)(2).

Viewing the evidence in the light most favorable to the State, appellant was in possession of the laptop stolen from the Main Street Church of Christ. He sold the computer to his former step-brother, Mr. Perry. Both the victim and Mr. Perry placed the value of the computer at greater than $1,000. The sole question was whether appellant burglarized the church and stole the laptop himself, was criminally responsible for the burglary and theft, or knew nothing of the crimes. Appellant relayed several accounts of how he came to be in possession of the computer. He indicated to Mr. Perry that he had accepted it as a barter from someone who could not pay for his services. He told Detective Burnett that he purchased it from a "rough-looking . . . skinny white guy" in a parking lot of a tobacco shop. At trial, appellant testified that he bought it from Trenoff in exchange for cocaine. To the contrary, the State presented Trenoff as a witness, who gave a completely different account. Trenoff explained that at appellant's behest, the two of them traveled together to break into the church but that Trenoff alone entered the building.

Appellant's specific challenge to the sufficiency of the convicting evidence was the credibility of Trenoff. This court has previously stated,

> [Appellant's] challenge to the sufficiency of the evidence invites this court to revisit the question of the victim's credibility . . . . Because the resolution of questions of fact, including witness credibility, is within the province of the jury, we must decline the defendant's invitation. By its verdict, the jury accredited the [witness's] testimony despite its sometimes inconsistent nature on particular details.

*State v. Thompson*, 36 S.W.3 102, 107 (Tenn. Crim. App. 2000); *see also State v. Stephens*, 264 S.W.3d 719, 740 (Tenn. Crim. App. 2007) (noting that appellant's challenge to the sufficiency of the evidence was based on the credibility of a witness and that this court will not discount the testimony of a witness and engage in a re-weighing or re-evaluation of the evidence on appeal). All witnesses were thoroughly cross-examined, and the jury assessed the testimony and evidence at trial. We will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379. From the evidence presented, a rational trier of fact could have found appellant guilty of burglary and theft on the theory of criminal responsibility. He is not entitled to relief on this claim.

B.  Sentencing

Appellant's specific complaint with regard to sentencing involves the trial court's weighing of the mitigating factors and the court's failure to consider appellant's payment of restitution as a mitigating factor.  We note that he contests only the lengths of his sentences and not the trial court's denial of alternative sentencing.

In determining an appropriate sentence, a trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant makes on his own behalf as to sentencing; and (8) the potential for rehabilitation.  Tenn. Code Ann. §§ 40-35-103(5), -113, -114, -210(b).  In addition, "[t]he sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed."  Tenn. Code Ann. § 40-35-103(4).

Pursuant to the 2005 amendments, the Sentencing Act abandoned the statutory presumptive minimum sentence and rendered enhancement factors advisory only.  *See* Tenn. Code Ann. §§ 40-35-114, -210(c).  The 2005 amendments set forth certain "advisory sentencing guidelines" that are not binding on the trial court; however, the trial court must nonetheless consider them.  *See id*. § 40-35-210(c).  Although the application of the factors is advisory, a court shall consider "[e]vidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114."  *Id*. § 40-35-210(b)(5).  The trial court must also place on the record "what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing."  *Id*. § 40-35-210(e).  The weighing of mitigating and enhancing factors is left to the sound discretion of the trial court.  *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008).  The burden of proving applicable mitigating factors rests upon appellant. *State v. Mark Moore*, No. 03C01-9403-CR-00098, 1995 WL 548786, at *6 (Tenn. Crim. App. Sept. 18, 1995).  The trial court's weighing of the various enhancement and mitigating factors is not grounds for reversal under the revised Sentencing Act.  *Carter*, 254 S.W.3d at 345 (citing *State v. Devin Banks*, No. W2005-02213-CCA-R3-DD, 2007 WL 1966039, at *48 (Tenn. Crim. App. July 6, 2007), *aff'd as corrected*, 271 S.W.3d 90 (Tenn. 2008)).

When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012).  If a trial court misapplies an enhancing or mitigating factor in passing sentence, said

error will not remove the presumption of reasonableness from its sentencing determination. *Id.* at 709. This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. *See Carter*, 254 S.W.3d at 346. The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

The record reflects that the trial court considered the requisite statutory factors in determining the lengths of appellant's sentences. The trial court found two mitigating factors: (1) that appellant's criminal conduct neither caused nor threatened serious bodily injury; and (2) that appellant assisted the authorities in uncovering offenses committed by other persons or in detecting or apprehending other persons who had committed offenses. Tenn. Code Ann. § 40-35-113(1), (9). However, the trial court attributed little weight to those factors. As an enhancing factor, the trial court found that appellant had a previous history of criminal convictions in addition to those necessary to establish the appropriate range. *Id.* § 40-35-114(1). Based on appellant's criminal history, the trial court found that this factor weighed "heavily" against appellant.

The trial court did not abuse its discretion in sentencing appellant. The sentence is within the appropriate range, and the record demonstrates that it was otherwise in compliance with the purposes and principles of sentencing. Although appellant's payment of restitution could have been considered as a mitigating factor under the "catch-all" provision,[2] we note that the Sentencing Act renders enhancing and mitigating factors merely "advisory" pursuant to the 2005 amendments. *Id.* §§ 40-35-114, -210(c). Moreover, as set forth above, the weighing of enhancing and mitigating factors is left to the sound discretion of the trial court. Appellant is not entitled to relief from his sentences.

---

[2] A defendant's "good faith attempt to compensate" the victim "[b]efore detection" is an enumerated mitigating factor. Tenn. Code Ann. § 40-35-113(5). However, this court has held that restitution made after detection constitutes a mitigating factor under the "catch-all" provision. *See State v. Mary McNabb*, No. 03C01-9404-CR-00135,1995 WL 48459, at *2 & n.3 (Tenn. Crim. App. Feb. 8, 1995) (citation omitted) (noting that a trial court need not and should not attribute as much weight to this factor as it would if restitution had been made prior to detection).

**CONCLUSION**

Based on our review of the record, the briefs of the parties, and the applicable legal authorities, we affirm the judgments of the trial court.

_____
ROGER A. PAGE, JUDGE